IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 1:15-cr-355 |
| v. | |
| GREGORY THADDEUS POSEY, | The Hon. Liam O'Grady |
| Defendant. | |

**POSITION OF THE UNITED STATES WITH RESPECT TO
SENTENCING AND RESTITUTION**

Gregory Thaddeus Posey ("the defendant") collected child pornography for several years, amassing a large collection of videos and still images depicting children being sexually abused. The defendant has pleaded guilty to possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4). The probation officer correctly calculated the guidelines range as 97-120 months' imprisonment. Nevertheless, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the parties have agreed that a sentence of 45 months is appropriate in this case. Accordingly, the United States respectfully recommends a sentence of 45 months' imprisonment.

**I.      THE STATUTORY PENALTIES AND GUIDELINE RANGE**

The statuary penalties are a maximum term of 10 years imprisonment, a maximum fine of $250,000, a special assessment of $100, restitution, and a supervised release term of five (5) years to life. Under the Sentencing Guidelines § 2G2.2, the defendant's base offense level is 18. The PSR correctly applied the following enhancements:

- the offense level is increased by two (2) levels pursuant to § 2G2.2(b)(2) because the material involved a prepubescent minor or a minor who had not attained the age of 12 years;

- the offense level is increased by two (2) levels pursuant to § 2G2.2(b)(3)(F) because the offense involved distribution of child pornography;[1]

- the offense level is increased four (4) levels pursuant to § 2G2.2(b)(4) because the images depicted sadistic conduct;

- the offense level is increased by two (2) levels pursuant to § 2G2.2(b)(6) because the defendant's conduct involved the use of a computer; and

- the offense level is increased by five (5) levels pursuant to § 2G2.2(b)(7)(D) because the defendant possessed the equivalent of more than 600 images of child pornography.

Because the defendant has accepted responsibility in a timely manner, the United States hereby moves for a three-point reduction under § 3E1.1.  Based on these calculations, the PSR correctly calculated an offense level of 30.  Because the defendant has a Criminal History Category of I, the resulting guidelines range would be 97-121 months.  Due to the ten-year statutory maximum, however, the guidelines range is capped at 97-120 months.  Nevertheless, once the Court accepted the defendant's plea agreement, which was entered pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the parties' agreement — that a sentence

---

[1] Defendant objects to the distribution enhancement but notes that the issue is immaterial because the plea was entered pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. Dkt. 41 at ¶1.  The United States agrees that the issue is immaterial but nonetheless believes the probation officer correctly assessed the enhancement because the PSR contains sufficient evidence to support a finding that the defendant knowingly used a peer-to-peer file-sharing program, which constitutes distribution.  *See United States v. Layton*, 564 F.3d 330, 335 (4th Cir. 2009) (holding that the knowing use of a peer-to-peer file-sharing program constitutes "distribution" for the purposes of U.S.S.G. § 2G2.2(b)(3)(F)).  Here, a law enforcement officer used a peer-to-peer file sharing program to download files from a digital media device at the defendant's residence.  *See* PSR at ¶¶ 15-22.  Further, a forensic analysis of defendant's digital media revealed that a peer-to-peer file sharing program had been installed and used.  *See* PSR at ¶¶ 30-37, 40-43.  Finally, defendant was a civilian computer specialist with the U.S. Army for almost 20 years. *See* PSR at ¶ 94.

of 45 months imprisonment is the appropriate disposition of the case — binds the Court.

## II. POSITION ON SENTENCING

### A. Factors Governing Sentencing

In *United States v. Booker*, 543 U.S. 220, 264 (2005), the Supreme Court made clear that sentencing courts should "consult [the Sentencing] Guidelines and take them into account when sentencing." *See also United States v. Biheiri*, 356 F.Supp.2d 589, 593 (2005) ("Justice Breyer's majority opinion in [Booker] sensibly teaches that the Sentencing Guidelines must still be taken into account pursuant to 18 U.S.C. § 3553(a) in fashioning an appropriate sentence."). The Supreme Court provided this direction to promote the sentencing goals of Congress, namely to "'provide certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities[.]'" *Booker*, 543 U.S. at 264 (quoting 28 U.S.C. §991(b)(1)(B)). The Fourth Circuit has provided the following post-Booker guidance:

> A district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence.

*United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Thus, sentencing courts must consider the factors outlined in 18 U.S.C. § 3553(a), including the need for the sentence "to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense; [and] to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A) and (B); *Biheiri*, 356 F.Supp.2d at 594.

Under 18 U.S.C. § 3553(k), the authorized term of supervised release for the defendant's offense is any term not less than five years to life. "Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson,* 529 U.S. 53, 59 (2000).

"Supervised release . . . is not a punishment in lieu of incarceration." *United States v. Granderson,* 511 U.S. 39, 50 (1994).   The authorized term of supervised release for the offense here reflects heightened concern about recidivism and the need for supervision over time.   *See* H.R. Rep. No. 107–527 at 2 (2002) (explaining that "studies have shown that sex offenders are four times more likely than other violent criminals to recommit their crimes.   Moreover, the recidivism rates do not appreciably decline as offenders age"); H.R. Conf. Rep. No. 108-66 at 49–50 (2003).   In considering the length and conditions of supervised release, the court should consider the nature and circumstances of the offense, the defendant's history and characteristics, adequate deterrence, the defendant's need for training, medical care or treatment, the kinds of sentence and range established in the Sentencing Guidelines, pertinent policy statements, the need to avoid unwarranted sentence disparities, and restitution.   *See* 18 U.S.C. §3583(c) (courts should consider the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4); (a)(5), (a)(6) and (a)(7));   *see also United States v. Helton,* 782 F.3d 148 at FN\* (4th Cir. 2015).

### B.     Application

Of the 3553(a) factors, the seriousness of the offense and the need to provide deterrence are particularly relevant in this case.   Possessing child pornography causes permanent damage to the children depicted in the images, as demonstrated by the Victim Impact Statements filed in this case.   This harm was recognized years ago by the United States Supreme Court in *New York v. Ferber*, 458 U.S. 747, 758 (1982).   In *Ferber*, the Supreme Court noted that, in the judgment of state and federal legislators, as well as authors of relevant literature, "the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child."   *Ferber,* 458 U.S. at 758 (citations omitted).   The *Ferber* court also observed that the "[pornographic] materials produced are a permanent record of the children's participation and the

harm to the child is exacerbated by their circulation." *Id.* at 759 (citation omitted). Furthermore, the court stated:

> Pornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt [the victim] in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography … It is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions.

Id at 759 & n. 10 (citations omitted). *See also Osborne v. Ohio,* 495 U.S. 103, 109-10 (1990) (reaffirming *Ferber* in case involving possession of child pornography).

In 2002, the United States Supreme Court again acknowledged the harm to victims depicted in child pornography and observed that a new harm is caused each time the images are shared with someone different. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 249 (2002). In *Free Speech Coalition,* the court noted that "as a permanent record of a child's abuse, the continued circulation itself would harm the child who had participated. Like a defamatory statement, each new publication of the speech would cause new injury to the child's reputation and emotional well-being." *Id.* at 249.

Moreover, in rejecting claims that the "mere" possession of child pornography is a victimless crime, courts have noted at least three specific harms inflicted on the children depicted in the pornographic images:

> First, the simple fact that the images have been disseminated perpetuates the abuse initiated by the producer of the materials. [T]he materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation. The consumer who "merely" or "passively" receives or possesses child pornography directly contributes to this continuing victimization.

5

> Second, the mere existence of child pornography represents an invasion of the privacy of the child depicted. Both the Supreme Court and Congress have explicitly acknowledged that the child victims of child pornography are directly harmed by this despicable intrusion on the lives of the young and the innocent. The recipient of child pornography obviously perpetuates the existence of the images received, and therefore the recipient may be considered to be invading the privacy of the children depicted, directly victimizing these children.
>
> Third, the consumer of child pornography instigates the original production of child pornography by providing an economic motive for creating and distributing the materials… [T]here is no sense in distinguishing, as [Defendant] has done, between the producers and the consumers of child pornography. Neither could exist without the other. The consumers of child pornography therefore victimize the children depicted in child pornography by enabling and supporting the continued production of child pornography, which entails continuous direct abuse and victimization of child subjects.

*United States v. Norris,* 159 F.3d 926, 929-30 (5th Cir. 1998).

The defendant here is the exact type of offender that Congress was concerned about when it enacted significant penalties for collecting child pornography. The defendant's conduct was repeated: he intentionally possessed child pornography over a significant time. This was not an accident, mistake, or crime that occurred from a momentary lapse of judgment. The repeated nature of the defendant's conduct and the extent of his collection of images of children being sexually abused justify a significant sentence in this case. Moreover, receipt of child pornography is a shockingly-widespread offense committed by people like the defendant who believe they are unlikely to get caught. The defendant's sentence should reflect the need to deter others like him whose desire to view child pornography outweighs concern about possible consequences. Therefore, the United States believes that both the nature and circumstances of the offense and the need for deterrence warrant imprisonment for 45 months and a supervised release term of at least 10 years.

### III. POSITION ON RESTITUTION

#### A. Background

The United States received three requests for restitution from the victims known as "Cassiopeia" from the Lighthouse series, "Cindy," and "Sarah" from the Marineland series. (PSR ¶¶ 50-54). Defendant and counsel for Cassiopeia and Cindy have reached agreement on the loss amount, and proposed restitution orders will be provided to the Court. The restitution request made by Sarah from the Marineland series is contested, however. As a preliminary matter, if the Court would like additional time to consider the issue and review the materials, the United States requests that the Court bifurcate the restitution issue, as is allowed under 18 U.S.C. § 3664(d)(5), for a period not to exceed 90 days.

#### B. Rule of Law

Title 18 U.S.C. § 2259 mandates restitution for any offense under Chapter 110, which includes crimes involving the exploitation of children. The amount of restitution is the "full amount of the victim's losses," as defined by 18 U.S.C. § 2259(b)(1) and (3). Specifically, § 2259(b)(3) provides that these losses include:

(A) medical services related to physical, psychiatric, or psychological care;

(B) physical and occupational therapy or rehabilitation;

(C) necessary transportation, temporary housing, and child care expenses;

(D) lost income;

(E) attorney's fees, as well as other costs incurred; and

(F) any other losses suffered by the victim as a proximate result of the offense.

A "court may not decline to issue an order under this section because of- (i) the economic circumstances of the defendant; or (ii) the fact that a victim has, or is entitled to, receive

compensation for his or her injuries from the proceeds of insurance or any other source." Title 18 U.S.C. § 2259(b)(4).

On April 23, 2014, the Supreme Court decided *Paroline v. United States*, 134 S.Ct. 1710 (2014). In *Paroline,* the Court held that restitution under Section 2259 was limited to losses proximately caused by a defendant's offense conduct. *Paroline,* 134 S.Ct. at 1722; *see also United States v. Burgess*, 684 F. 3d 445 (4th Cir. 2012). The Court rejected a "but-for" causation standard and instead found:

> In this special context, where it can be shown that a defendant possessed a victim's images and that the victim has outstanding losses caused by continuing traffic in those images *but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying §2259 should order restitution in an amount comporting with the defendant's relative role in the causal process underlying the victim's general losses*.

*Paroline,* 134 S.Ct. at 1727 (emphasis added).

Following *Paroline,* district courts should, "as a starting point, determine the amount of the victim's losses caused by the continuing traffic in the victim's images . . . then set an award of restitution in consideration of factors that bear on the relative causal significance of the defendant's conduct in producing those losses." *Id.* at 128. To determine a defendant's relative role, the Court observed a "variety of factors" a district court might consider, although it is "neither necessary nor appropriate to prescribe a precise algorithm." *Id.* at 1728.

Among the non-exhaustive factors identified were: (1) "the number of past criminal defendants found to have contributed to the victim's general losses;" (2) "reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses;" (3) "any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted);" (4) "whether

8

the defendant reproduced or distributed images of the victim;" (5) "whether the defendant had any connection to the initial production of the images; how many images of the victim the defendant possessed;" and (6) "other facts relevant to the defendant's relative causal role."  *Id.*

### C. Analysis

*Paroline,* as discussed above, involves a three-step analysis for the Court in this case: first, determine if defendant's offense proximately caused Sarah's losses; second, determine the amount of Sarah's losses caused by the continuing traffic in her images; and third, set an award of restitution in consideration of factors that bear on the relative causal significance of the defendant's conduct in producing those losses.  The amount should neither be "severe" nor "token" or "nominal." *Id.* at 1727.

#### i. Proximate Cause

With respect to proximate cause, in this case, based on an analysis conducted by the National Center for Missing and Exploited Children (NCMEC) of the defendant's collection of images, the defendant possessed eleven (11) image files, including duplicates, and one (1) video file involving the Marineland series.  As demonstrated by the information provided by Sarah's counsel, Sarah has an outstanding loss caused by the continuing traffic in her images.  *See* PSR at ¶51 and pp. 115-33; *see also Paroline,* 134 S.Ct. at 1726 ("It is common ground that the victim suffers continuing and grievous harm as a result of her knowledge that a large, indeterminate number of individuals have viewed and will in the future view images of the sexual abuse she endure"); *Burgess,* 684 F.3d at 459 ("[i]t is well established that children featured in child pornography are harmed by the continuing dissemination and possession of that pornography. Such images are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation."); *United States v. McIntosh,* 4:14-CR-28 (EDVA 2014) (Dkt.

9

#212), 2014 WL 5422215 ("Because defendant received Vicky's images, he played a part in sustaining and aggravating the injury. It is indisputable that [defendant] was a part of the overall phenomenon that caused Vicky's general losses.") (citations and inner quotations omitted). Accordingly, defendant has contributed to Sarah's general loss despite that the United States cannot trace a particular amount of those losses to him. *Id.* at 1727; *but see United States v. Hanlon,* 2015 WL 310542 (M.D. Fla. 2014).

### ii. The Victim's Losses

As to defendant, Sarah has amended her restitution request, and now seeks $10,000 in restitution and $1,500 in attorney fees. *See* PSR at ¶51 and pp. 115-33. Extensive documentation provided by counsel for Sarah reflects the full amount of her economic losses as $2,748,235.19 as follows: $448,552 in psychological counseling expenses, $2,273,436 in lost income, and $27,708.41 in out-of-pocket costs and expenses incurred for restitution documentation. Sarah has received $96,720.45 against her losses, leaving a balance of $2,651,514.74. *See* PSR at ¶51 and pp. 115.

### iii. Defendant's Relative Causal Role

The United States does not have complete statistics on the number of past or future offenders, who either were caught and convicted or will be caught and convicted for crimes contributing to Sarah's general losses. Nor does the United States have a reliable estimate of the broader number offenders who will never be caught. According to Sarah's counsel, Sarah has received 299 prior restitution orders. She noted, however, that not all individuals pay the full amount of the order (or any portion) and that the collection rate is approximately ten percent. *See* PSR at pp. 117.

The United States has also attached a list compiled by the Department of Justice's Child

Exploitation and Obscenity Section (CEOS), which tracks some restitution awards associated with child pornography convictions related to the Sarah series as of June 2016. *See* Exhibit A. This list is largely comprised of data self-reported by Assistant United States Attorneys and CEOS Trial Attorneys. It only includes restitution awards in federal criminal cases prosecuted in the United States and likely is an under-representation of even that subset of cases. It does not include state prosecutions or cases elsewhere in the world. The attached list shows that as of June 2016, one hundred forty-one (141) defendants were ordered to pay restitution to Sarah. The mean (average) restitution order was $4,739.06, the median (middle) restitution order was $3,000.00, and the mode (most frequent) was $3,000.00.

Defendant did not have any connection to the initial production of Sarah's images. Therefore, the following factors contribute to the restitution award. The known victim series Sarah is widely distributed among those who seek and distribute child pornography. In this case, defendant possessed one (1) video of Sarah[2] and 11 image files, including duplicates, from the Marineland series. The Court should consider the nature of the video and image files possessed by defendant. In this case, the video file depicted what appeared to be two prepubescent females engaged in sexual activity, including oral and digital penetration. Three (3) of the four (4) unique image files depicted the lascivious exhibition of a prepubescent girl's vagina, and the fourth unique image file depicted an adult male penetrating the buttocks of a minor female with his penis. The image and video files appeared to be located in back-up files, and therefore, there is no evidence as to how these images were received or whether they were distributed.

## IV.   CONCLUSION

For the foregoing reasons, the United States respectfully requests that the court impose a

---

[2] Thus, the total number of images in Guideline terms is 75. *See* U.S.S.G. §2G2.2, Application Note 4.

sentence of 45 months' imprisonment, to be followed by a supervised release term of at least 10 years. The United States also requests that the court impose restitution in an amount comporting with the defendant's relative role in the causal process in consideration of the request made by Sarah and the foregoing analysis.

        Respectfully submitted,

        Dana J. Boente
        United States Attorney

                /s/
        Kellen S. Dwyer
        Tracy Doherty-McCormick
        Assistant U.S. Attorney
        Office of the United States Attorney
        2100 Jamieson Avenue
        Alexandria, Virginia 22314
        Tel: (703) 299-3700
        Fax: (703) 299 3981
        Email: kellen.dwyer@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record in this case.

                          /s/
                          Kellen S. Dwyer
                          Assistant U.S. Attorney
                          Office of the United States Attorney
                          2100 Jamieson Avenue
                          Alexandria, Virginia 22314
                          Tel: (703) 299-3700
                          Fax: (703) 299-3981
                          Email: kellen.dwyer@usdoj.gov